UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| 1600 EAST NEWLANDS DRIVE, LLC,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>AMAZON.COM.NVDC, LLC, et al.,<br><br>　　　　Defendants. | Case No. 3:17-cv-00566-RCJ-WGC<br><br>**ORDER** |

Following the trial held August 17–21, 2020, the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

The Court makes the following findings of fact:

1. Plaintiff 1600 East Newlands Drive, LLC ("Plaintiff" or "END") is the former owner of the industrial property located at 1600 East Newlands Drive, Fernley, Nevada (the "Property").

2. The warehouse on the Property was built in 1996.

3. On December 14, 1998, Defendant Amazon.com, Inc. signed a lease with the then-owner of the Property, Panattoni Development Company ("Panattoni"). (Def. Ex. 501 (Original

Lease) §§ 1.01–1.03)[1] Defendant Amazon.com, Inc. moved into the Property in January 1999.

4. In November 1999, Defendant Amazon.com, Inc. and Panattoni executed the Third Amendment which, among other things, substituted Defendant Amazon.com.NVDC, Inc. as the assigned Tenant. In January 2000, Amazon.com, Inc. executed a Guarantee of Lease under which it guaranteed the Amazon.com.NVDC, Inc.'s performance under the Lease. The Court refers to Defendants collectively as "Amazon."

5. The Original Lease is a pre-printed form, with a few strikeouts and additions and states that it is governed by Nevada law. (Original Lease § 13.09.)

6. During the term of the Lease, Amazon used the Property as a fulfillment center.

7. In August 1999, Amazon exercised its option to require that Panattoni expand the Property by building a new eastern side of the warehouse, increasing the size of the building from 322,560 square feet to more than 588,000 square feet. (Addendum to Lease § 6.1; Second Amendment § 1.) The newly-built eastern side of the warehouse was sometimes referred to as the "Utah" side, to distinguish it from the original "Nevada" side of the building.

8. The Lease was amended several times over the years, including extending the Lease term. (*See* First–Sixth Amendments.) After accounting for the amendments, the Court finds the following provisions of the contract significant:

    A. Original Lease § 1.12(b) states, in pertinent part, "OTHER PERIODIC PAYMENTS: (i) Real Property Taxes . . . ; (ii) Utilities . . . ; (iii) Insurance Premiums . . . ; (iv) Impounds for Insurance Premiums and Property Taxes . . . ; (v) Maintenance, Repairs[,] and Alterations . . . ."

---

[1] Def. Ex. 501 contains the original lease, the addendum to the lease, and each of the six amendments to the lease. To avoid confusion, the Court cites to each document by its name.

B. Original Lease § 2.04 states, in pertinent part:

> **Holding Over.** Tenant shall vacate the Property upon the expiration or earlier termination of this Lease. Tenant shall reimburse Landlord for and indemnify Landlord against all damages which Landlord incurs from Tenant's delay in vacating the Property. If Tenant does not vacate the Property upon the expiration or earlier termination of the Lease and Landlord thereafter accepts rent from Tenant, Tenant's occupancy of the Property shall be a "month-to-month" tenancy, subject to all of the terms of this Lease applicable to a month-to-month tenancy . . . .

C. Original Lease § 4.05 states, in pertinent part: "[I]f Landlord does not receive any rent payment within ten (10) days after written notice from Landlord that such payment is overdue, Tenant shall pay Landlord a late charge equal to five percent (5%) of the overdue amount and remit the overdue amount within three (3) business days."

D. Original Lease § 4.06 states, in pertinent part, "Any amount owed by Tenant to Landlord which is not paid after written notice from Landlord that such payment is overdue shall bear interest at the rate of fifteen percent (15%) per annum from the due date of such amount."

E. Original Lease § 5.06 states, in pertinent part, "Any . . . access by Landlord or its agents . . . shall only be permitted . . . [when] Landlord . . . give[s] Tenant reasonable prior notice of any desired access . . . . Any such access shall be strictly in accordance with such security . . . requirements as Tenant may require . . . ."

F. Original Lease § 6.04(a) states, in pertinent part:

> Tenant shall keep all portions of the Property (including structural, nonstructural, interior, exterior, and landscaped areas, portions, systems and equipment) in good order, condition and repair (including interior repainting and refinishing, as needed), <u>subject to normal wear and tear</u>. If any portion of the Property or any system or equipment in the Property which Tenant is obligated to repair cannot be fully repaired or restored, Tenant shall promptly replace

such portion of the Property or system or equipment in the Property, regardless of whether the benefit of such replacement extends beyond the Lease Term; but if the benefit or useful life of such replacement extends beyond the Lease Term (as such term may be extended by exercise of any options), the useful life of such replacement shall be prorated over the remaining portion of the Lease Term (as extended), and Tenant shall be liable only for that portion of the cost which is applicable to the Lease Term (as extended) and <u>shall receive a refund from Landlord for any portion after the Lease Term</u>. Tenant shall maintain a preventative maintenance contract providing for the regular inspection and maintenance of the heating and air conditioning system by a licensed heating and air conditioning contractor. If any part of the Property is damaged by any act or omission of Tenant, Tenant shall pay Landlord the cost of repairing or replacing such damaged property, whether or not Landlord would otherwise be obligated to pay the cost of maintaining or repairing such property. It is the intention of Landlord and Tenant that at all times Tenant shall maintain the portions of the Property which Tenant is obligated to maintain in an attractive, ~~first class~~ and fully operative condition subject to normal wear and tear.

G. Original Lease § 6.06 states, in pertinent part:

Upon the termination of the Lease, Tenant shall surrender the Property to Landlord, broom clean and in the same condition as received (with such alterations as Landlord shall have approved, if approval <u>is required or for which approval was not required</u>) except for ordinary wear and tear which Tenant was not otherwise obligated to remedy under any provision of this Lease.

H. Original Lease § 12.01 states, in pertinent part:

If any action for breach of or to enforce the provisions of this Lease is commenced, the court in such action shall award to the party in whose favor a judgment is entered, a reasonable sum as attorneys' fees and costs. The losing party in such action shall pay such attorneys' fees and costs. Tenant shall also indemnify Landlord against and hold Landlord harmless from all costs, expenses, demands and liability Landlord may incur if Landlord becomes or is made a party to any claim or action (a) instituted by Tenant against any third party, or by any third party against Tenant, or by or against any person holding any interest under or using the Property by license of or agreement with Tenant; (b) for foreclosure of any lien for labor or material furnished to or for Tenant or such other person; (c) otherwise arising out of or resulting from any act or transaction

        of Tenant or such other person; or (d) necessary to protect Landlord's interest under this Lease in a bankruptcy proceeding, or other proceeding under Title 11 of the United States Code, as amended. Tenant shall defend Landlord against any such claim or action at Tenant's expense with counsel reasonably acceptable to Landlord . . . .

    I.    Original Lease § 13.02(b) states, in pertinent part:

        Tenant shall give written notice of any failure by Landlord to perform any of its obligations under this Lease to Landlord . . . . Landlord shall not be in default under this Lease unless Landlord . . . fails to cure such non-performance within thirty (30) days after receipt of Tenant's notice. However, if such non-performance reasonably requires more than thirty (30) days to cure, Landlord shall not be in default if such cure is commenced within such thirty (30)-day period and thereafter diligently pursued to completion.

    J.    Sixth Amendment § 2 states, "<u>Extended Term</u>. The Lease Term is hereby extended for nine (9) months (the 'Second Extended Term') commencing September 1, 2014 and terminating on May 31, 2015."

    K.    Sixth Amendment § 4 states, "<u>Holdover Rent</u>. If Tenant has not vacated the Property by June 1, 2015, the Monthly Base Rent will increase to $431,355.61."

9.    In 2003, END purchased the Property from Panattoni for approximately $22.6 million and became the successor landlord under the Lease. (*See* Fourth Amendment § A.) At that time, Amazon had already been a tenant at the Property for about five years. (*See* Original Lease § 1.01.) END contracted with its affiliated company, Investment Grade Loans (IGL), to oversee and manage the Property.

10.    In 2014, Amazon decided to move out of the Property rather than seek another long-term extension of the Lease. In August 2014, Amazon informed END that it only wanted to extend the existing Lease term by another nine months, to give it time to move out.

///

11. On September 30, 2014, Amazon signed the Sixth (and final) Amendment to the Lease, which extended the Lease term nine months, to May 31, 2015, and specified the applicable rate of holdover rent if Amazon had not "vacated" the Property by June 1, 2015.

12. Amazon shut down its fulfillment center operations at the Property after the 2014 holiday shopping season.

13. On or about January 30, 2015, Amazon entered into a contract with United Construction Company (United). Under this contract, United would manage the "decommissioning" of the Property. Testimony from Amazon indicated that "decommissioning" included removing all of Amazon's corporate effects from the Property and restoring it to, at a minimum, the condition required by the Lease. The total cost of the decommissioning work was anticipated to be approximately $2.7 million. This initial contract included $51,887 for restoration of the HVAC systems.

14. The Decommissioning Contract was modified through several change orders:

    A. Change Order No. 1, dated March 26, 2015, added $281,949 in costs and modified the scope of work to include "asphalt remediation."

    B. Change Order No. 2, dated March 27, 2015, added $872 in costs and modified the scope of work to include "paint and patch downspout area."

    C. Change Order No. 3, dated March 30, 2015, added $225,444 in costs and modified the scope of work to include "slab on grade repair and remove signage/ striping."

    D. Change Order No. 4, dated April 24, 2015, added $395,220.00 in costs and modified the scope of work by adding allowances to various move-out requirements, including water tank remediation, caulk on the dock area, exterior painting, and floor remediation in the battery charging area.

///

  E. Change Order No. 5, dated May 21, 2015, added $382,565 in costs and modified the scope of work to add an additional allowance for HVAC repairs.

  F. Change Order No. 6, dated November 11, 2015, deducted $212,135.49 in costs in a "final cost reconciliation."

15. When the Lease's May 31, 2015 termination date arrived, all of Amazon's employees, operations, inventory, and equipment had been removed from the Property, except for those employees who would periodically visit the Property to oversee the ongoing decommissioning project. However, United employees and subcontractors still remained on the Property to finish the decommissioning.

16. From late 2014 through July 2015, Amazon ultimately spent approximately $3.8 million making extensive repairs and improvements to the Property.

17. The parties participated in an end-of-lease walkthrough of the Property on June 23, 2015. At this time, END received two keys from Amazon to access the warehouse.

18. United's 30(b)(6) witness, Mr. Mike Clements, testified that the best documentary source for determining what work was actually performed at the Property, and when it was performed, is United's daily construction reports. The last of these daily construction reports is dated June 12, 2015, but documentary evidence from United also indicates repair work being done through the end of July.

19. END ultimately sold the Property in April 2016 (within a year of the Lease term expiring) for $16.4 million. The sale occurred without END ever completing most of the repairs for which it now seeks damages.

20. At no time did Amazon explicitly indicate that it has surrendered the Property back to END, but rather maintained control of the Property until United finished the construction work.

///

21. In mid-May 2015, just two weeks before Amazon was to vacate the Property, Amazon requested that United "get the HVAC contractor engaged to . . . do things like stop the leaks, replace filters, investigate further the needs – basically start the bare minimum repairs while we get the rest of the financing secured."

22. The HVAC restoration work was primarily performed by two contractors: RHP Mechanical Systems, Inc. (RHP) and Providence Electric, Inc. (Providence).

23. On May 18, 2015, United's HVAC subcontractor, RHP, provided a lengthy itemized list of all components of the HVAC system that required repair.

24. On May 20, 2015, United issued a Subcontract Change Order in the amount of $41,537.00 to RHP to "Furnish and Install HVAC Equipment."

25. On June 2, 2015, United issued a Subcontract Change Order to RHP in the amount of $139,363.00 to "furnish and install HVAC equipment."

26. On June 10, 2015, United issued a Subcontract Change Order to RHP in the amount of $3,836.00 to "furnish and install a Lennox Rooftop Unit."

27. On July 20, 2015, United issued a change order to Providence in the amount of $21,910.00, for "Additional Electric Scope."

28. The testimony of RHP's 30(b)(6) witness, Mr. Michael Scolari, shows that two evaporative cooler units were replaced.

29. United retained access to the Property until it mailed END the keys to the Property on or about September 2, 2015.

30. After the Lease terminated on May 31, 2015, Amazon continued to require END to obtain Amazon's permission to access the Property. For example, on June 19, 2020, END requested that Amazon allow access to the building. Amazon advised that the keys were with United.

31. The triple net expenses under § 1.12(b) were $35,258 for June 2015 and $35,258 for July 2015.

32. After United had completed its work under the Decommissioning Contract and Amazon had left the building, a number of items remained to be repaired. Specifically, Amazon:

   A. failed to repair or replace torn and stained portions of the interior carpeting,

   B. failed to adequately paint areas of the interior walls which it had patched,

   C. failed to adequately repair all of the truck dock locks,

   D. removed 750 lockers from the Property,

   E. failed to repair multiple gas leaks in the HVAC system, and

   F. failed to adequately inspect the fire sprinkler system.

33. The remaining items of the Property were adequately repaired.

**CONCLUSIONS OF LAW**

The Court makes the following conclusions of law:

1. The Lease, along with all Amendments thereto, and the Guarantee constitute a valid and enforceable contract between END and Amazon.

2. *Consumers Distrib. Co. v. Hermann*, 812 P.2d 1274 (Nev. 1991) provides controlling precedent for this case.

3. Under both the explicit terms of the Lease and the Sixth Amendment and the facts and circumstances surrounding Amazon's efforts to decommission and repair the Property, the Court finds that a holdover tenancy existed from June 2015 until Amazon brought the Property into substantial repair in July 2015.

4. First, during that period, Amazon maintained exclusive access to the Property. Amazon advised END that if it wanted to access the Property, it was required to obtain access by speaking to United. Although Amazon did not deny END access to the property when

requested, it remains that END could only obtain access by making a request to Amazon's agent. In effect, END had to comply with Original Lease § 5.06 both before and after the official termination date of the Lease.

5. Second, the cost and extent of the repairs that Amazon performed after May 31, 2015 were substantial. Amazon paid United over $3.8 million dollars under the Decommissioning Contract. It is not clear exactly how much of this was for work performed after May 31, 2015, but at least a few hundreds of thousands of dollars in work was. These repairs continued to the end of July 2020.

6. Third, the evidence shows that END was eager to relet or sell the warehouse. END advised Amazon that its real estate broker, Mr. Dave Schuster, needed to visit the property in March. In addition, in the Sixth Amendment, END specifically required Amazon to agree to pay a holdover rate of $431,355.61 if it did not vacate the building by May 31, 2015.

7. Fourth, the evidence shows that END advised Amazon that it expected repairs to be performed by May 31, 2015. Amazon's internal emails show that Amazon believed that repairs had to be completed by May 31, 2015. Thus, END provided Amazon with ample notice of its repair obligations.

8. Amazon therefore owes END two months of holdover rent for the months of June and July 2015 at the rate specified by the Sixth Amendment as well as the triple net expenses for those two months under § 1.12(b) of the Original Lease.

///

///

///

///

///

9. END established at trial that Amazon failed to return certain items of the Property to the condition required under the Lease. The Court therefore awards damages to END in the following amounts:

    A. $5,000 for the carpeting,

    B. $10,000 for the interior wall painting,

    C. $5,000 for the truck dock locks,

    D. $20,000 for the lockers,

    E. $7,500 for the leaks in gas lines, and

    F. $5,000 for the fire system.

10. Whether END was entitled to holdover rent had been subject to genuine dispute since END first requested it in July 2015. Therefore, the Court concludes that the Lease provisions mandating that Amazon pay a late fee and 15% interest per annum for overdue payments for these damages are inapplicable. Rather, the Court determines that no late fee is warranted and imposes the typical interest rate of Nevada state court judgments as determined under NRS 99.040(1).

11. The Court denies Amazon counterclaim for reimbursement for replacing evaporative coolers. While the evidence shows that Amazon replaced two evaporative cooling units, this was merely to bring the Property's cooling system to be operational.

IT IS SO ORDERED.

Dated November 2, 2020.

_____
ROBERT C. JONES
United States District Judge